UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 03-CV-5142 (JFB)(AKT)

WARREN DELUCA,

Plaintiff,

VERSUS

ALLIED DOMECQ QUICK SERVICE RESTAURANTS,

Defendant.

MEMORANDUM AND ORDER
June 13, 2006

JOSEPH F. BIANCO, District Judge:

Plaintiff Warren DeLuca brings this action alleging employment discrimination based on his age and retaliation in violation of the Federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (the "ADEA"), and the New York State Human Rights Law, N.Y. Exec. § 296(1) ("NYHRL"). Plaintiff alleges that Allied Domecq Quick Service Restaurants[1] ("Dunkin' Donuts" or "Dunkin'") disc-riminated against him by reassigning him, firing him, and later denying him a Dunkin' Donuts franchise because of his age and in retaliation for his complaints about defendant's actions. (*See* Compl. ¶¶ 15,

19-21, 22, 24-26.) Defendant moves for summary judgment. For the reasons that follow, defendant's motion is granted in part and denied in part.

I. BACKGROUND

A. THE FACTS

Construed in a light most favorable to plaintiff, the non-moving party, the facts are as follows:

Dunkin' is an international franchisor of quick service restaurants. (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 11.)[2] Franchisees are licensed to operate under the Dunkin' Donuts system. (*Id.*) Plaintiff Warren DeLuca was born on March 18, 1957, and was hired in April 1994, by Andrew Wiltshire, a

---

[1] The defendant is a publicly traded United Kingdom company. The claims at issue in this case concern plaintiff's employment by Dunkin' Donuts, defendant's wholly-owned subsidiary. (*See* Mag. Judge James Orenstein's Rep. & Rec., 1 n.1 (Feb. 24, 2006); Def.'s Rule 56.1 Statement ¶ 11.)

[2] Where one party's 56.1 Statement is cited, the other party does not dispute the facts alleged.

Dunkin' general manager. (*Id.* ¶¶ 1, 3.) DeLuca was fired on June 5, 2002. (*Id.* ¶ 7.)

### 1. DeLuca's employment from 1994 until 1998

DeLuca was hired as a business consultant, serving as the first level of supervision over sixty to seventy Dunkin' Donuts franchises. (*Id.* ¶ 20.) DeLuca worked primarily in the tri-State area of New York, New Jersey, and Connecticut. (*Id.* ¶ 21.) When DeLuca started his employment with Dunkin', he reported to Wiltshire. (*Id.* ¶¶ 4, 21.) Following a subsequent reorganization, DeLuca reported to a director of retail operations, who in turn, reported to a senior market executive, the highest position in each market. (*Id.* ¶ 21.)

Shortly after DeLuca started his employment with Dunkin', he applied to become a franchisee. (Pl.'s 56.1 Counter-Statement ("Pl.'s 56.1") ¶ 22.) Although Wiltshire encouraged DeLuca to become a franchisee, another Dunkin' supervisor, Tony Pellizzi, Sr., denied DeLuca's application because DeLuca was doing a superior job as a business consultant. (*Id.* ¶ 22.) After DeLuca's application was denied, his sisters applied for, and were permitted to become, Dunkin' franchisees. (Def.'s 56.1 ¶ 22.)

In April 1996, DeLuca was promoted to general manager. (*Id.* ¶ 23.) Wiltshire encouraged and supported DeLuca's promotion and, indeed, for a brief period following DeLuca's promotion, he and Wiltshire were peers. (*Id.* ¶¶ 23, 25; Pl.'s 56.1 ¶ 23.) On or about September 1996, DeLuca's job title changed from general manager to director of retail operations. (Def.'s 56.1 ¶ 24.) This change of job title did not represent a promotion or change in salary for DeLuca. (Pl.'s 56.1 ¶ 24.) Also in the Fall of 1996, Wiltshire was promoted to senior market executive. (Def.'s 56.1 ¶ 25.)

At some point in the late 1990s, and continuing throughout DeLuca's employment, Dunkin' rated its franchises based on an A, B, or C scale. (*Id.* ¶ 26.) A and B-rated franchises qualified for expansion, while C-rated franchises were franchises that did not meet Dunkin' standards. (*Id.*)

As part of Dunkin's reorganization, the position of director of retail operations (DeLuca's position) was made responsible for either A and B-rated franchises, or C-rated franchises. (*Id.* ¶ 27.) When DeLuca became director of retail operations, he initially oversaw A and B-rated franchises. (*Id.* ¶ 28.) DeLuca performed well in this position, and received high performance ratings from Wiltshire. (*Id.*)

### 2. DeLuca's 1998 Reassignment

At some point after December 9, 1998, DeLuca was reassigned by Wiltshire from overseeing A and B-rated franchises to overseeing C-rated franchises. (*Id.* ¶ 29.) DeLuca was happy with this decision because overseeing C-rated franchises presented a greater challenge and responsibility for DeLuca, as well as the opportunity to earn larger bonuses. (Pl.'s 56.1 ¶ 29.) DeLuca informed Wiltshire of this, and Wiltshire indicated that he was satisfied with DeLuca's work. Wiltshire also said to DeLuca that, by transferring him to C-rated franchises, there would not be any potential conflict of interest with his sisters' stores, which were all A-rated. (*Id.* ¶¶ 26, 29; Def.'s 56.1 ¶ 31.)

In his new capacity as director of retail operations over C-rated franchises, DeLuca supervised several business consultant specialists, including Lou Beccarelli. (Def.'s 56.1 ¶ 32.) In November 2000, DeLuca completed a performance review of Beccarelli, writing that "Lou is . . . ready to assume a director role within the market and will be endorsed for a director position when

one becomes available should his current performance continue. Outstanding leadership abilities." (*Id.* ¶ 33.) DeLuca's recommendation of Beccarelli was for A/B-rated franchises only. (Pl.'s 56.1 ¶ 33.)

3. DeLuca's Fall 2000 Reassignment

In the Fall of 2000, a director position overseeing A/B-rated franchises became available in the New York market overseen by Wiltshire. (Def.'s 56.1 ¶ 34.) DeLuca recommended Beccarelli for this position. (*Id.*) Based on the adversarial nature of Beccarelli's past dealing with C-rated franchises, DeLuca limited his recommendation of Beccarelli to A/B-rated franchises. (Pl.'s 56.1 ¶ 34.) Wilthsire did not assign Beccarelli to the open director position overseeing A/B-rated franchises. Rather, he transferred DeLuca to this position and promoted Beccarelli as director over the C-rated franchises. (*Id.* ¶ 35; Def.'s 56.1 ¶ 35.) This reassignment took effect at some point in August or September 2000. (Def.'s 56.1 ¶ 35.)

DeLuca was concerned about Wiltshire's decision to reassign him to oversee A/B-rated franchises. (*Id.* ¶¶ 35, 36; Pl.'s 56.1 ¶ 35.) Because DeLuca's sisters were franchisees of A/B-rated stores, there was a greater potential for a conflict of interest because of DeLuca's supervision of business consultants who oversaw his sisters' stores. (Def.'s 56.1 ¶ 35.) DeLuca advised several Dunkin' employees, including Wiltshire, Pellizzi, Beccarelli, and others, that he should remain overseeing C-rated franchises because of potential conflicts. (Pl.'s 56.1 ¶ 35.) To address DeLuca's concerns, Wiltshire offered to serve as an intermediary between DeLuca and his sisters' stores to avoid any conflicts of interest. (*Id.*)

4. Dunkin's Conflict of Interest Policies

Throughout DeLuca's employment with Dunkin', various policies were in place prohibiting employees from being involved in situations creating an actual or perceived conflict of interest. (Def.'s 56.1 ¶ 41.) These policies are included, *inter alia*, in the (1) March 4, 2002 Code of Conduct; (2) the Global Employee Workplace Policies Manual, dated 2000; (3) the Business Code of Ethics and Standards of Conduct, dated August, 1999; (4) the Interests of Employees and Their Relatives in Franchisee Businesses, dated April 7, 1994; and (4) the Dunkin' Donuts Code of Ethics Poliy. (*Id.* ¶ 42.) DeLuca asserts that he was not aware of these policies, nor was he ever provided with a written copy of any of these policies. (Pl.'s 56.1 ¶ 41.)

Dunkin' amended the Code of Conduct in 2002 to incorporate a revised Code of Conduct that its parent company had issued. (Def.'s 56.1 ¶ 43.) Additional training attended by DeLuca was conducted in 2002 to highlight the importance of the Code of Conduct. (*Id.*; Pl.'s 56.1 ¶ 43.)

5. Conflicts of Interest With DeLuca and His Sisters' Stores

Even though Wiltshire told DeLuca he would serve as an intermediary between him and his sisters to avoid conflicts of interest, DeLuca claims that Wiltshire ordered him to interact with his sisters' franchises on Dunkin's behalf. (Pl.'s 56.1 ¶ 38.) Specifically, Wiltshire ordered DeLuca to contact one of his sisters and gauge her interest in purchasing used kitchen equipment from a Dunkin' training facility. (*Id.*) In another incident, a business consultant supervised by Wiltshire asked DeLuca to get involved in the negotiation of a lease on behalf of his sisters. (*Id.*) Separately, Wiltshire discussed with DeLuca, his sisters'

3

interest in a group of stores referred to as the "Passavea" network. (*Id.*) These conflicts were discussed at length in a report prepared by Michael Mershimer (the "Mershimer Report") responding to complaints by several individuals about improprieties in the New York market. (*Id.*; Def.'s 56.1 ¶ 54.)

6. The Mershimer Meeting and Report

In November 2001, Mershimer, then Dunkin's Director of Loss Prevention, held a meeting in New Jersey because he had received a complaint that several individuals in the New York market were improperly receiving gifts from a vendor. (Def.'s 56.1 ¶¶ 49, 50.) The complaint was directed generally toward the New York market, and both Wiltshire and DeLuca, among others, attended the meeting. (*Id.* ¶ 51.) At this meeting, Mershimer discussed the complaint and Dunkin's guidelines for accepting gifts. (*Id.* ¶ 52.) Mershimer also informed those in attendance that there would be another meeting taking place to discuss a revised Code of Conduct. (*Id.*) DeLuca was not directly implicated in any wrongdoing, and was not subjected to any discipline as a result of this meeting. (*Id.*)

Thereafter, in early 2002, DeLuca attended a meeting hosted by Mershimer to discuss the revised Code of Conduct. (*Id.* ¶ 45.) Many who attended this meeting questioned Mershimer about practices engaged in by the New York market. (Pl.'s 56.1 ¶ 45.) DeLuca repeatedly questioned Mershimer regarding golf outings because DeLuca knew that Mershimer often accepted golf trips from vendors and franchisees of Dunkin'. (*Id.*) After this exchange, Mershimer advised DeLuca, through Beccarelli, that DeLuca had better "back-off." (*Id.*)

At approximately the same time as this meeting, a number of individuals advised Mershimer that there were "issues" in the New York market that should be investigated. (Def.'s 56.1 ¶ 54.) Mershimer's superiors asked him to look into allegations of alleged improprieties and conflicts of interest in the New York market. (*Id.*) One of the allegations was that DeLuca and Pellizzi had engaged in nepotism. (*Id.* ¶ 55.) In connection with this investigation, Mershimer conducted in-person interviews with DeLuca, Wiltshire, Beccarelli, and others, and gathered relevant documents and e-mail.[3] (*Id.* ¶ 57.)

The Mershimer Report made, *inter alia*, the following findings as to DeLuca:

(1) DeLuca was negotiating lease terms for his sister with a broker and landlord in early 2001. Wiltshire investigated this and gave DeLuca a verbal warning, and also stated that he had discussed with DeLuca in the past the need for him to maintain "arms length" regarding his sisters' business. DeLuca acknowledged the warning but disagreed with the presumption that the situation posed a conflict. Wiltshire did not turn this situation over to human resources or loss prevention for an independent investigation. In retrospect, he commented that he should have turned the matter over. DeLuca was also involved in the negotiation of the sale of a number of stores for his sisters. (Def.'s Mem. Ex. 4F.)

---

[3] Plaintiff does not contest the fact that this investigation took place. Plaintiff does, however, contend that the report was "inaccurate and incomplete," that Mershimer did not discuss the specific allegations against DeLuca with Wiltshire, and that Wiltshire "took no responsibility and maintained no accountability for events referenced in the investigation. (Pl.'s 56.1 Statement ¶ 57.)

4

(2) DeLuca sent an e-mail offering $1,000 spot award if five tasks were completed expeditiously. All but one involved DeLuca's sisters' stores, and would likely result in a financial benefit to his sister in the form of increased sales. (*Id.*)

(3) DeLuca's wife reportedly made several telephone calls on behalf of his sisters to correct payment discrepancies. She did this on a volunteer basis. In a conversation with Ray Raymond and Mershimer, DeLuca did not acknowledge that this was a conflict because his wife was not on his sisters' payroll, and was only occasionally helping. (*Id.*)

(4) Wiltshire reported to Mershimer that DeLuca "sat in on" a responsibility meeting for his sisters' Mineola store. A meeting such as this is not typically attended by someone in DeLuca's position. (*Id.*)

The Mershimer Report also discussed a conflict involving Pellizzi and Pellizzi's son, wherein Pellizzi allegedly assisted and facilitated the sale of a network of stores to his son. (Pl.'s 56.1 ¶ 42.) Pellizzi was not fired for this action. (*Id.*)

RoJean DeChantal, Dunkin' senior vice president and human resources officer, was one of the executives who was aware of Mershimer's investigation and report. (Def.'s 56. 1 ¶ 58.) DeChantal later relied exclusively on Mershimer's report in making her decision with regard to DeLuca. (Pl.'s 56.1 ¶ 58.)

### 7. Dunkin' Fires DeLuca

Following Mershimer's Report, DeChantal, Dunkin's senior vice president for human resources, reviewed the Report to decide the appropriate action to take in light of the Mershimer's findings. (Def.'s 56.1 ¶ 60.) DeChantal did not personally know DeLuca during this time. (*Id.* ¶ 66.) DeChantal did not conduct her own investigation. (Pl.'s 56.1 ¶ 60.)

Based on DeChantal's review of Mershimer's Report, she concluded that DeLuca had committed serious violations of Dunkin's code of conduct in connection with the franchises operated by his sisters. (*Id.* ¶ 61.) On or about June 5, 2002, Dunkin' fired DeLuca, conlcuding it had "lost trust" in his judgment. (Def.'s 56.1 ¶ 69.)

At the time of DeLuca's dismissal, he was forty-five years old, and DeChantal was fifty-six years old. (*Id.* ¶ 63.) DeLuca does not know if DeChantal was aware of his age. (DeLuca Dep. at 219-20.)

As a result of the findings of Mershimer's report, Wiltshire was reprimanded. In addition, Pellizzi, who was fifty-eight at the time, was not fired by DeChantal because he had not been previously warned.[4] (Def.'s 56.1 ¶ 68.)

Shortly after DeLuca was fired, Dunkin' held meetings about rules and regulations concerning conflicts of interest. (Def.'s 56.1 ¶ 70.) According to DeLuca's deposition testimony, someone who attended the meetings referred to them as the "DeLuca Meetings." (DeLuca Dep. at 283.)

---

[4] According to Mershimer's report, DeLuca had been warned by Wiltshire in early 2001 when DeLuca negotiated the lease terms for his sister. (Def.'s Mem. Ex. 4F.)

5

### 8. DeLuca Applies for a Franchise

At some point prior to February 2003, DeLuca applied to become a Dunkin' Franchisee.[5] (DeLuca Dep. at 173.) DeLuca did not express an interest in a particular franchise. (Def.'s 56.1 ¶ 71.) Because of the circumstances surrounding DeLuca's termination, Joseph Benny, Dunkin's franchise licensing manager, discussed DeLuca's application with Wiltshire, and one of them brought DeLuca's request to the attention of Arthur Anastos, who was legal counsel for the New York market. (*Id.* ¶ 73.) Anastos later referred DeLuca's application to Dunkin's General Counsel Steven Horn. (Pl.'s 56.1 ¶ 71.)

In February 2003, Benney informed DeLuca that his application had been denied. (Pl.'s 56.1 ¶ 71.) The decision to deny DeLuca a franchise was made by Steven Horn. (*Id.*) It was unusual for Horn to be consulted with respect to a pending franchisee application, as he might only hear about an application "from time to time." (*Id.*) In addition, Jack Laudermilk, an associate general counsel at Dunkin' was also involved. (*Id.*) This was also atypical. (*Id.*)

According to Horn, the decision to deny DeLuca's application was based on the fact that DeLuca had been terminated for cause, and based on "characteristics of persons we would want to hire as franchisees who were former employees." (Horn Dep. at 15-16.) Although Dunkin' does not maintain a written policy concerning potential franchisees who had been fired for cause, there was a policy, as described by Horn:

> [U]pper management, higher management of this company, since I've been involved in the company, would not look favorably upon franchising an employee who had been fired for cause. If it was brought to the attention of . . . the enterprise leadership team, we might look to the particular circumstances . . . . I can say with confidence that the upper levels of management in this company would not look favorably on enfranchising someone who had been fired under the circumstances that were involved in [DeLuca's] discharge. So I was confident in making the judgment when it was brought to my attention for a decision.

(Horn Dep. at 70-71.) Horn testified that he does not recall whether he had knowledge of the existence of DeLuca's EEOC Charge when he made the decision to deny DeLuca's franchise application. (Horn Decl. ¶ 15.)

Another franchise owner, Ever Santana, was terminated for cause, and then later permitted to become a part franchise owner. (*Id.* ¶ 16; DeLuca Dep. at 207-08.) The franchise application of Santana was not referred to the legal department. (Horn Decl. ¶ 85.)

### B. PROCEDURAL HISTORY

Plaintiff filed a complaint in this action on October 9, 2003, within 90 days of receiving his right to sue letter from the EEOC. Plaintiff's complaint alleges violations of the ADEA and NYHRL based on defendant's alleged unlawful employment actions based on plaintiff's age, and retaliation following complaints made by plaintiff against defendant. The case was originally assigned

---

[5] Defendant asserts DeLuca merely "expressed an interest," while plaintiff counters that DeLuca "formally" applied. DeLuca's deposition testimony indicates he "applied" for a franchise, and Dunkin' submitted an affidavit that it has no record of DeLuca formally applying. (DeLuca Dep. at 173; Horn Decl. ¶ 11.)

to the Honorable Denis R. Hurley and, on September 9, 2004, the case was reassigned to the Honorable Dora L. Irizarry. The parties engaged in discovery, and on August 4, 2005, defendant moved for summary judgment. On April 12, 2006, this case was reassigned to the undersigned. Oral argument was held on May 25, 2006.

II. DISCUSSION

A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

B. AGE DISCRIMINATION UNDER THE ADEA[6]

The ADEA states, it is "unlawful for an employer . . . to discharge an individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.

---

[6] Claims of age discrimination brought under New York State law are analyzed using the same framework as claims brought under the ADEA, and the outcome under state law will be the same as the outcome under the ADEA. *See Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999).

§ 623(a)(1). Because plaintiff presents no direct evidence of discriminatory treatment based on his age, the Court reviews his ADEA claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" *Roge v. NYP Holdings, Inc*. 257 F.3d 164, 168 (2d Cir. 2001) (quoting *O'Conner v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis*." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once a plaintiff establishes a *prima facie* case of discrimination "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Woodman*, 411 F.3d at 76 (citing *Slattery v. Swiss Reinsurance Am. Corp*., 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant articulates a legitimate, nondiscriminatory reason, plaintiff must then prove that defendant's articulated reasons are pretextual. *See id.* at 76. "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited [age] discrimination occurred.'" *Id*. (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

8

1. APPLICATION AS TO PLAINTIFF'S TERMINATION[7]

Plaintiff alleges discrimination in connection with his termination in June 2002. As set forth below, defendant has demonstrated that it is entitled to summary judgment on this claim because no reasonable jury could find age discrimination based on the facts in this case.

At the outset, the Court assumes the plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. In response, Dunkin' has established a legitimate non-discriminatory reason for DeLuca's dismissal, namely, that DeLuca was fired by Dunkin' following an investigation that uncovered a violation of Dunkin's Code of Ethics with regard to his dealings with his sisters' stores. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find age discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515. First, the Court evaluates the plaintiff's evidence, then the defendant's evidence, and then the evidence as a whole.

a. Plaintiff's Evidence of Age Discrimination

Plaintiff submits the following as evidence of defendant's discrimination based on his age:

First, plaintiff was forty-five years old when he was fired. *See Williams v. Brooklyn Union Gas Co.*, 819 F. Supp. 214, 225 (E.D.N.Y. 1993) (holding plaintiff must come forward with more than his age). Second, plaintiff was fired based solely on Mershimer's report, which was incomplete and inaccurate. Third, other employees, including Pellizzi and Wiltshire, were implicated in wrongdoing by Mershimer's report, but they were not fired. Finally, plaintiff argues that Mershimer held a grudge against him, based on DeLuca's confrontation at the meeting in early 2002.

---

[7] In addition to claiming discrimination based on his termination in June 2002, plaintiff alleges that defendant discriminated against him based on his age by transferring him in 2000. This claim is dismissed for two reasons. First, it is time-barred. Acts such as job transfers, or demotions, are discrete acts, and thus independently subject to a 300-day time limitation. *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 112-13 (2002); *See* 42 U.S.C. § 2000e-5(e)(1); *Forsyth v. Fed'n Employment and Guidance Serv.*, 409 F.3d 565, 572 (2d Cir. 2005); *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 133 (2d Cir. 2003); *Harris v. City of New York*, 186 F.3d 243, 247 n.2 (2d Cir. 1999) (noting that in New York, a plaintiff must file an administrative charge within 300 days of knowing or having reason to know of the alleged discriminatory act). Plaintiff filed his EEOC in November 2002. Thus, the discrete act by defendant of transferring plaintiff in 2000 falls well beyond the 300-day time limitation. *See Forsyth*, 409 F.3d at 572 ("Discrete discriminatory acts are time-barred, notwithstanding the fact that 'they are related to acts alleged in timely filed charges,' if they fall outside of the limitations period.") (quoting *Morgan*, 536 U.S. at 113). Second, DeLuca's 2000 transfer was not, as a matter of law, an unlawful employment action. DeLuca's transfer was for a position at the same level as his former position, and he received a $20,000 raise. *See Galabaya v. New York City Bd. of Educ.*, 202 F.3d 636, 649 (2d Cir. 2000). Hence, that claim is dismissed.

### b. Defendant's Evidence of Non-discriminatory Animus

Defendant submits the following evidence of non-discriminatory animus:

First, plaintiff's conduct violated Dunkin's policies regarding conflicts of interest and, based on the facts uncovered by Mershimer, DeLuca had been previously warned about potential conflicts of interest regarding his sisters' stores. Second, the person who made the decision to fire plaintiff, DeChantal, did not even know plaintiff, much less his age, and made her decision solely based on Mershimer's report. Third, although neither Pellizzi nor Wiltshire were fired based on their conduct, DeChantal found that Pellizzi (who was fifty-eight at the time) had not been previously warned, and Wiltshire was given a warning. Fourth, plaintiff has failed to submit any evidence, beyond the fact he is forty-five years old, that he was discriminated against based on his age.

### c. Evidence as a Whole

Considering the evidence as a whole, the Court concludes that no reasonable juror could find that plaintiff was fired based on his age. Indeed, the undisputed evidence is that DeChantal was the individual who made the decision to fire plaintiff, relying entirely on Mershimer's report. (*See* Pl.'s 56.1 ¶¶ 60, 61.) Although plaintiff argues that this fact supports an inference of discrimination based on his age, the fact that the decision to fire plaintiff was made by someone who did not even know plaintiff's age, based entirely on a report that even plaintiff admits on its face shows violations, supports a finding that plaintiff was not fired based on his age. *See Norton*, 145 F.3d at 120. An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). *See also Norton*, 145 F.3d at 120 ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age."); *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988); *Slatky v. Healthfirst, Inc.*, 2003 U.S. Dist. LEXIS 20608 (S.D.N.Y. 2003) ("The employer could terminate the plaintiff for a good reason, a bad reason, or no reason at all, so long as it was not a discriminatory reason.") (citing *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1341 (1st Cir. 1988)) ("ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision does not stem from the person's age."); *State Div. of Human Rights ex rel. Cottongim v. County of Onondaga Sheriff's Dep't.*, 528 N.Y.S.2d 802, 804 (N.Y. 1988) (finding under Human Rights Law that employee "could lawfully have been discharged for any reason or for no reason, but not for a statutorily impermissible reason").

Plaintiff's fundamental position concerning Mershimer's report is that it was flawed and, therefore, DeChantal's conclusions regarding DeLuca must be "false" and "pretextual." (*See* Pl.'s Opp. at 14.) Even assuming Mershimer's report was flawed or false, there is nothing to suggest that the decision was a pretext for age discrimination. *See Norton*, 145 F.3d at 120. Significantly, plaintiff points to no comment, action, or fact that even remotely suggests defendant's decision to fire him was based on his age except the fact that he was forty-five years old. Such evidence is insufficient in this case to withstand defendant's motion for summary judgment. *Williams*, 819 F. Supp. at 225.

Similarly, the fact that Pellizzi, who was fifty-eight years old at the time, received a

lesser punishment than DeLuca is further evidence that DeChantal was not discriminating based on age. Rather, the Pellizzi evidence supports defendant's argument that DeChantal fired DeLuca because he had previously been warned, and gave Pellizzi a lesser sanction. No reasonable jury could find that DeChantal, who did not know DeLuca, and who relied exclusively on Mershimer's report in considering whether to fire plaintiff, actually fired him because of his age.

Finally, although not dispositive, the fact that DeChantal was fifty-six, and Wiltshire is only three months younger than DeLuca creates a presumption that the decision to fire DeLuca was not based on his age. *See Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2002) (finding plaintiff's evidence of age discrimination "thin" when, in part, the decision-makers were also in the protected age category); *Morris v. N.Y. City Dep't of Sanitation*, No. 99 Civ. 4376, 2003 U.S. Dist. LEXIS 5146, at *25 (S.D.N.Y. March 31 2003); *Pisana v. Merrill Lyncy & Co.*, 1995 U.S. Dist. LEXIS 10296, at *14 (S.D.N.Y. July 20, 1995) ("The fact that . . . decision makers were close to [plaintiff's] age, or older, weakens any suggestion of age discrimination.") (citing *Williams v. Brooklyn Union Gas Co.*, 819 F. Supp. 214, 225 (E.D.N.Y. 1993)).

For these reasons, no reasonable jury could find that plaintiff was fired because of his age. Indeed, the only reasonable conclusion is that plaintiff was fired based on DeChantal's review of Mershimer's report finding that plaintiff violated Dunkin's Code of Conduct. Thus, summary judgment dismissing plaintiff's age discrimination claims under the ADEA and NYHRL is granted.

C. RETALIATION[8]

1. Applicable Law

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal

---

[8] Defendant argues that plaintiff's retaliation claims based on its denial of a franchise application are not exhausted. (*See* Def.'s Mem. at 18, 19.) Plaintiff's EEOC complaint alleges that defendant retaliated against him, although it does not allege retaliation based on defendant's denial of a franchise because the denial had not happened when the EEOC complaint was filed. The "reasonably related rule" in the Second Circuit "has been broadly construed to allow judicial redress for most retaliatory acts arising subsequent to an EEOC filing . . . ." *Malarkey v. Texaco*, 983 F.2d 1204, 1209 (2d Cir. 1993); *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178 (2d Cir. 2005); *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)*, superceded by statute on other grounds as stated in Hawkins v. 1115 Legal Servs. Care*, 163 F.3d 684, 693 (2d Cir. 1998). Here, the alleged retaliatory act is based on plaintiff's filing of an administrative complaint, and was near in time to the filing of that complaint. This is precisely the type of facts the Second Circuit has found to constitute "reasonably related" conduct. *See Butts*, 990 F.2d at 1401; *Malarkey*, 983 F.2d at 1209; *see also Soares v. Univ. of New Haven*, 175 F. Supp. 2d 326, 330 (D. Conn. 2001). Further, there has been no showing of prejudice to defendant in permitting plaintiff to pursue the claim in this lawsuit. *See Malarkey*, 983 F.2d at 1209. Hence, there is no basis for rejecting plaintiff's retaliation claim regarding the denial of his franchise application as not reasonably related to his EEOC complaint. *Id.*

citations omitted). To establish a prima facie case of retaliation, DeLuca must show (1) he engaged in a protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry*, 336 F.3d at 141.

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3; *see also Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1991). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Moreover, to establish that his activity is protected, DeLuca "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209; *see also Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989).

A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

Although the burden that a plaintiff must meet at the prima facie stage is minimal, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995).

2. Application[9]

Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas*. *Terry*, 336 F.3d at 141 (2d Cir. 2003). The Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. Plaintiff filed an EEOC complaint, Dunkin' was aware of the EEOC complaint, and the filing of the EEOC complaint was close in time to the denial of a franchise. (*See, e.g.,* May 25, 2006 Oral Arg. Tr. at 9.) The dispute is whether the denial of a franchise can constitute an adverse employment action.

---

[9] Plaintiff's complaint alleges retaliation by defendant for transferring him in 2000, and for investigating him. However, plaintiff's counsel implicitly concedes in his papers, and conceded at oral argument, that plaintiff never engaged in any protected activity prior to his firing. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997). Plaintiff has apparently abandoned these retaliation claims by failing to oppose defendant's motion, and for only including the denial of his franchise application as evidence of retaliation in the parties' joint pre-trial order. *See Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 363 n. 9 (2d Cir. 2004); *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004); *Arbercheski v. Oracle Corp.*, No. 05 Civ. 591 (DLC), 2005 WL 2290206, at *3 (S.D.N.Y. Sept. 19, 2005). In any event, to the extent plaintiff alleges defendant retaliated against him by transferring or investigating him, those claims are dismissed as plaintiff has failed to put forth any evidence that he engaged in a protected activity prior to these actions by defendant.

Defendant argues that its decision to deny a franchise application to a former employee cannot constitute an adverse employment action as a matter of law. The Court disagrees. The denial of a franchise application in the instant case could constitute a retaliatory adverse employment action. An employer's denial of a former employee's franchise application is in the same realm of acts such as "blacklisting" an employee or refusing to write a letter of recommendation, both of which the Second Circuit has found sufficient to state a cause of action based on retaliation. *See Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979) (holding that "blacklisting" an employee is sufficient to state a cause of action based on retaliation); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1055 (2d Cir. 1978) (holding that an employer's refusal to give employee a letter of recommendation is sufficient to state a cause of action for retaliation); *see also Sarno v. Douglas Elliman-Gibbons & Ives*, 183 F.3d 155, 160 (2d Cir. 1999); *Cohen v. S.U.P.A. Inc.*, 814 F. Supp. 251, 261 (N.D.N.Y. 1993).

Although a franchise relationship may not constitute an "employment" relationship, the Second Circuit case law on retaliation cannot be construed so narrowly as to strictly require disruption of a future "employment" relationship, as opposed to some other analogous business relationship. The hallmark of these cases is that the alleged retaliation *arose* out of the former employment. *See, e.g., Cohen*, 814 F. Supp. 251, 261 (holding that, to survive summary judgment, alleged retaliation need only show "employer's use of discrimination in connection with a prospective, present or past employment relationship to cause harm to another") (quoting *Pantchenko*, 581 F.2d at 1055); *Patel v. Lutheran Med. Ctr.*, 753 F. Supp. 1070, 1073 (E.D.N.Y. 1991) ("The Second Circuit has held that federal antidiscrimination statutes such as the ADEA, prohibit 'discrimination related to or arising out of an employment relationship, whether or not the person being discriminated against is an employee at the time of the discriminatory conduct.'") (quoting *Pantchenko*, 581 F.2d at 1055).

Therefore, if an employer retaliates against a former employee for engaging in protected activity by attempting to deny the former employee an ability to enter into a subsequent business relationship, such conduct is actionable regardless of whether that future business relationship is employer/employee, independent contractor or consultant, or some other analogous business relationship. *See Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F. Supp. 144, 150 (S.D.N.Y. 1987) (discontinuation of a contract with an employee working as a consultant after termination stated cause of action for retaliation); *accord Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir. 1991) (finding that "the statute does not limit its reach only to acts of retaliation that take the form of cognizable employment actions").

Here, under the circumstances of this case, the Court concludes that defendant's denial of a franchise application to DeLuca, a former employee, constitutes an adverse employment action.[10] *See Silver*, 602 F.2d at 1090

---

[10] In its papers and at oral argument, defendant also argues that because of the unique statutory and legal relationship between a corporation and its franchisee, the denial of a franchise cannot constitute an unlawful employment action. In other words, defendant argues that it is entitled to broad discretion, in part, because its relationship with its franchisees is heavily regulated and lasts for many years. The Court rejects this argument.

13

(discrimination statutes "furnish a remedy against discrimination in employment, no matter what specific form the invidious practice takes").

Having found that plaintiff has met his *prima facie* case, the Court proceeds to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation. Defendant has articulated a legitimate, nondiscriminatory reason for denying plaintiff's franchise application, contending that, based on the circumstances leading to his firing, he was not the type of person Dunkin' wanted to allow to have a franchise.

Notwithstanding defendant's nondiscriminatory reason for denying plaintiff's franchise application, defendant's motion for summary judgment as to plaintiff's retaliation claim is denied. There are issues of fact as to whether DeLuca's application to become a franchisee was handled in a different manner by Dunkin' because DeLuca had engaged in a protected activity. *See Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 318-19 (S.D.N.Y. 2005) ("All too often . . . employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case."); *Alvarez v. City of New York*, 31 F. Supp. 2d 334, 344 (S.D.N.Y. 1998); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 762 (2d Cir. 1998).

---

An employer, if it is acting in an illegal retaliatory manner towards a former employee, is not protected from liability simply based on the fact that a franchisee relationship will be heavily regulated and potentially last for many years.

The parties do not dispute that DeLuca's franchise application was handled differently than other applications. This was, according to defendant, for good reason, given the fact that DeLuca was recently fired for cause. On the other hand, DeLuca asserts that the reason his franchise application was dealt with differently than other applications was because he had filed a discrimination claim with the EEOC. In support of that argument, plaintiff points to the fact that, not only was his application treated differently than other franchise applications generally, but it was treated differently than a similarly situated former employee who was fired for cause and, nonetheless, received a franchise. In particular, Ever Santana was terminated for cause, and then later was permitted to become a part franchise owner. Courts have consistently held that one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity. *See Knight v. City of New York*, 303 F. Supp. 2d 485, 498-99 (S.D.N.Y. 2004); *see also DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (discrimination can be established "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct"). Although defendant has presented an explanation for why plaintiff's application was handled differently than Santana's, a reasonable jury could find, based on this evidence, that at least one reason DeLuca's application was handled in this manner, and eventually rejected, was in retaliation for his filing an EEOC complaint. Thus, defendant's motion for summary

judgment on plaintiff's retaliation claim is denied.[11]

## IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in part and denied in part. The remaining claims are those alleging retaliation by defendant following plaintiff's filing of an EEOC complaint. The parties shall appear by telephone for a final pre-trial conference on June 20, 2006, at 10:00 a.m., to set a date for trial. Plaintiff shall initiate the telephone call and call Chambers at 631-712-5670 when all of the parties are on the line.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 13, 2006
Central Islip, NY

\* \* \*

Plaintiff is represented by Saul D. Zabell, Esq., Zabell & Associates, P.C., 700 Lakeland Avenue, Bohemia, New York 11716. Defendant is represented by Robert L. Zisk, Esq., and Tristan B.L. Siegel, Gray, Plant, Mooty, Mooty & Bennett, P.A., The Watergate, 2600 Virginia Avenue, N.W., Suite 1111, Washington, D.C. 20037, and Robert L. Duston, Esq., Schmeltzer, Aptaker & Shepard, P.C., The Watergate, 2600 Virginia Avenue, N.W., Suite 1000, Washington, D.C. 20037.

---

[11] Pending before this Court is a Report and Recommendation issued by Magistrate Judge James Orenstein recommending to this Court that it exclude as evidence certain statements made by an associate general counsel for Dunkin' in a mediation session. Both parties have timely filed objections to Magistrate Judge Orenstein's Report and Recommendation. As noted above, without relying on these statements, sufficient issues of fact exist as to plaintiff's retaliation claim to withstand a motion for summary judgment. As these alleged statements are not relied upon by the Court in this decision, it is now purely an evidentiary issue for trial. The Court will decide it, in conjunction with other motions *in limine* submitted by the parties, in a schedule to be established by the Court when a trial date is set.